# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA,      :
           :     **CRIMINAL INDICTMENT NO.**
     **v.**              :     **1:11-CR-136-JEC/AJB-01**
           :
**JOSHUA McCULLOUGH,**       :
           :
     **Defendant.**        :

## UNITED STATES MAGISTRATE JUDGE'S
## NON-FINAL REPORT AND RECOMMENDATION

In this case, the government seeks to introduce evidence seized during a search of the Backwoods Bar & Grill ("BB&G"), a business entity the government alleges provided funding for marijuana grow houses. Presently before the Court is the motion of Defendant Joshua McCullough seeking to suppress evidence from a search by warrant on December 8, 2010, of BB&G's premises, located at 2220 Jodeco Road, in McDonough, Henry County, Georgia. [*See* Doc. 156]. In a prior R&R, the Court concluded that an evidentiary hearing was necessary to establish whether McCullough had standing to contest the search and seizure at that location. [Doc. 133 at 103]. An evidentiary hearing was held, [Doc. 415 (hereinafter "T__")], after which the parties filed briefs, [Docs. 403 (McCullough), 438 (Government), 439 (McCullough)]. For the following reasons, the undersigned **RECOMMENDS** that the motion be **DENIED** on

the grounds that McCullough has not established standing to contest the search of the BB&G premises.

## I.    Standing

### A.    *Facts*

The evidentiary-hearing evidence was as follows: BB&G is a bar located in McDonough, Henry County, Georgia.  T65.  McCullough owned the bar; however, his wife was listed as the organizer in the original paperwork when it was a limited liability company ("LLC"), with McCullough listed only as its registered agent.  T68, 71; Gov't Ex. 2.[1]  McCullough testified that in July 2010, he registered the business with Henry County as a sole proprietorship doing business as "The Woods."  T72.[2]  McCullough oversaw the business's day-to-day operation.  T68.  He spent six to ten hours a day at the bar.  T68-69.  The liquor license was in his name.  T69-70.  He was the ultimate decisionmaker as to hiring and firing.  T70.  McCullough testified that he employed

_____

[1]    Gov't Ex. 2 is a copy of records from the Georgia Secretary of State containing the annual registration history for Backwoods Bar & Grill, L.L.C. as of November 9, 2011.  The records reflect that Backwoods Bar & Grill, L.L.C., was created on September 9, 2005, its last annual registration statement was filed on February 9, 2010, and its status as of November 9, 2011, was "Active/Noncompliance."

[2]    A sole proprietor in Georgia must register the business's trade name with the Clerk of the Superior Court of the county in which it does business.  O.C.G.A. § 10-1-490(a).

AO 72A
(Rev.8/8
2)

two managers, whose duties included supervision of the operations, closing up, and handling the liquor and security. T69, 73.

The business contained public and non-public areas. T65-66. The public areas included a sitting area, pool tables, a dance floor, and the bar, and held up to 139 people. T65. The non-public areas included a kitchen, cooler room, storage, and an office. T66. The office area was upstairs from the public area, in what is best described as a loft. *Id.* McCullough testified that the door leading to the stairs had a sign stating "Employees Only" and that the door to the stairway was supposed to be locked. T67-68. McCullough, the bar's managers, and the janitor possessed the key. T67.[3] The only door to the office was the one at the base of the stairs. T68. The public was not allowed in the office. *Id.* Other employees such as bartenders, waitresses, bar backs, cooks, and security were not allowed in the office without being accompanied by a manager or obtaining a key from a manager. T69. The managers had free access to the office while at work. T73. McCullough testified that his wife was present in the office only when he was. T74-75.

_____

[3]    At the hearing, McCullough denied telling law enforcement that he was the only person with access to the office and testified that he did not recall stating during a telephone call recorded from jail that he lied about who had access to the room to protect another person. T74.

AO 72A
(Rev.8/8
2)

McCullough was not present at the bar when the search warrant was executed on December 8, 2010, T74, although he was observed there by police surveillance the previous day. T86.

The office contained a safe and a computer. T70.[4] The bar's business records were maintained in the office filing cabinets, desk drawers, and computer. T70, 75. The records included bank statements generated by the bank. T74.

In executing the search warrant, the officers were looking for any type of documents that would pertain to BB&G, as well as any kind of financing for the grow houses, including business documents, computers, and information concerning Old South Amusements—which the officers believed also was involved in financing the grow houses. T77, 79. At the time the search warrant was executed, the door to the stairs leading up to the office was not locked. T77.

The office contained filing cabinets and an L-shaped desk with a back panel. T78. The officers searched the file cabinets and the desk. T79. They seized documents that appeared not to be related to running the bar business and all bank records. T80. None of the seized documents appeared to be written solely by McCullough. T81. In an open safe on the desk were two plastic bags containing cocaine, a quantity of

---

[4]     Another safe was located behind the bar. T70.

marijuana, and U.S. currency, and a firearm was located in a holster underneath the desk. T80, 84, 86. The currency was seized as suspected drug money due to its close proximity to the drugs. T81. The officers also took an external hard drive that was in the safe, as well as another hard drive (although its location was not detailed). T82.[5]

Officers spoke to one of the three managers, Shaun Brown, the day manager, who indicated that the managers, McCullough, and Mrs. McCullough had access to the office area. T82.

---

[5] The inventory of the search, attached to Doc. 241, Ex. G, shows the following items being seized:

(1) 1 Beretta mod. 92 FS- 9 cal;
(2) 4 Beretta magazines with 9 mm ammunition;
(3) miscellaneous paperwork;
(4) 1 glass jar containing suspected marijuana;
(5) 2 clear bags containing an off-white substance;
(6) 1 32gb hard drive;
(7) 4 bundles of U.S. currency ($400 total);
(8) HP Pavilion A1710N hard drive;
(9) Isuzu Box Truck (impounded);
(10) roll of Old South Amusement tape;
(11) 2 Memorex DVD+R DL - copy of Centon 32gb hard drive (item # 6); and
(12) 1 Verbatim DVD-R - copy of HP Pavilion computer (item # 8).

Bates No. RPT-000627. The exhibit also contains a return for a search on December 15, 2010, at 108 South Zack Hinton Parkway. *See id.* Because the parties did not explain the relevance of this document to the instant motion, the Court will not discuss it.

AO 72A
(Rev.8/8
2)

## B.    Contentions of the Parties

McCullough argues that the evidence at the hearing established that he had a reasonable expectation of privacy in the office of the bar. He relies mainly on the fact that the office was off-limits to the public, which led the court in *O'Rourke v. Hayes*, 378 F.3d 1201, 1206 (11th Cir. 2004), to hold that to search a non-public area of a business, a warrant was required. [Doc. 403 at 2-3]. He argues that if a warrant is required in that situation, he should be found to have a legitimate expectation of privacy under the facts in this case. [*Id.*]. McCullough also relies upon *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1117 (9th Cir. 2005), where the court held that where family members owned the office and managed the business on a day-to-day basis, they had a legitimate expectation of privacy over calls made at the premises. [Doc. 403 at 4].[6]

McCullough further argues that he has standing to challenge the search because (1) the business at the time of the search was run as his sole proprietorship; (2) he held the liquor license in his name; (3) he was the ultimate personnel decisionmaker; (4) access to the office was limited to the managers he hired; and (5) his policy was that

_____

[6]    The case is incorrectly cited in Defendant's briefs as *United States v. Gonzalez.*

6

the access to the office was further restricted by a locked door with only a few designated persons having a key. [*Id.* at 4]. He also contends that he personally was the subject of the search because the bar was not alleged to have engaged in illegal conduct, the police were simultaneously searching his residence and BB&G, and he was arrested following the search of his home.[7] [*Id.* at 5]. In further support of his argument that he personally was the subject of the bar search, he points out that paperwork of another one of his businesses, Preferred Amusements, was located during the search. [*Id.*]. He also argues that because he had custody and control of the premises, he has standing to contest its search. [*Id.* at 5-6 (citing *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984))].

The government responds that McCullough lacks standing under the applicable test for standing in a business setting outlined by the cases in the Eleventh Circuit, notably *United States v. Bush*, 582 F.2d 1016, 1018-19 (5th Cir. 1978)[8] (describing the factors for corporate officer standing as: whether (1) the documents seized were

_____

[7] McCullough avers that this arrest explains why he was not on the business premises at the time of the search. [Doc. 403 at 4].

[8] The Eleventh Circuit has adopted as binding precedent decisions of the Fifth Circuit, including Unit A panel decisions of that circuit, rendered prior to October 1, 1981. *See United States v. Todd*, 108 F.3d 1329, 1333 n.5 (11th Cir. 1997); *Limelight Prods., Inc., v. Limelite Studios, Inc.*, 60 F.3d 767, 769 n.1 (11th Cir. 1995).

7

prepared by the defendant; (2) the searched materials were stored in personal or corporate storage; (3) the defendant was present on the premises when searched; and (4) the search was directed at corporate activity as opposed to the corporate officer personally). [Doc. 38 at 11, 12]. It notes that the documents seized were prepared by third parties, primarily banks, and none appeared to have been prepared exclusively by McCullough.[9] [*Id.* at 12]. It also seized documents relating to Old South Amusements, since that entity likewise was alleged to engage in financing the grow houses. [*Id.*]. The government further points out that the items seized were in a filing cabinet and desk in the bar's office area and that the drugs, currency, and firearm were properly seized from the open safe because they were in plain view. [*Id.* at 12-13]. Next, the government notes that McCullough was not present at the time of the search and did not appear on the scene during the search. [*Id.* at 13-14]. It also contends that the search targeted the bar's activities and not McCullough personally. [*Id.* at 14]. The government then argues that McCullough did not establish that he exclusively prepared any of the documents nor did he secure the office for his exclusive use. [*Id.*]. Instead,

---

[9] The government also contends that on the seized portable hard drive were located bar documents and photographs, including those of McCullough, co-defendants, and the grow house under construction at 1680 Jodeco Road. [Doc. 438 at 12 n.5].

AO 72A
(Rev.8/8
2)

the government claims that numerous other employees had access to the office and that the office was not secured from the publicly accessible areas. [*Id.*].

The government next argues that while McCullough was not at the bar when it was searched, neither was he at his home as it was being searched, as he claims. Instead, he was called back to his home by his children; thus, the government argues, this fact cuts against his argument that he was not present at the scene of the bar search because he was arrested elsewhere. [*Id.* at 14 & n.7].[10] In any event, the government points out that McCullough has failed to address any of the other *Bush* factors. [*Id.* at 15].

The government further submits that it is not contending that a commercial owner has no expectation of privacy in commercial property, but rather that McCullough has not shown that he possessed a reasonable expectation of privacy in the bar property. [*Id.*]. In this regard, it argues that since others had access to the office

---

[10]     The government argues that the Court should not consider McCullough's arguments about his arrest because there is no evidence in the record as to the circumstances of his arrest. While the government's point is well-taken, the Court will consider defense counsel's statement nonetheless, because the government also proffers out-of-court evidence and because none of the out-of-court evidence affects the Court's conclusions regarding the motion now before it.

AO 72A
(Rev.8/8
2)

and the door to the stairway leading to the office was unlocked, McCullough's argument that he could expect privacy in the office is undercut. [*Id.*].

With few exceptions, McCullough's reply brief is identical to his opening brief; the Court summarizes those differences that are of consequence. First, as to *O'Rourke*, McCullough again argues that the case stands for the proposition that if a warrant is required to search a place, the warrant must be valid and that "an individual's otherwise reasonable expectation of privacy is not defeated because he utilizes employees in areas of a business not open to the public." [Doc. 443 at 4]. Next, he argues that while the government produced evidence that the door to the stairwell leading to the office was unlocked, the government only called as a witness the second officer who entered the office; there was no evidence of what the first officer found other than there was no forced entry. [*Id.* at 5]. He also argues that the incriminating nature of any evidence on the external hard drive could not have been readily apparent, and so the hard drive was improperly seized. [*Id.* at 6 n.2].

### C.   *Discussion*

#### 1.   *Legal Framework*

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. Amend. IV.  To challenge a seizure as violating the Fourth Amendment,

10

a defendant must have "standing," *i.e.*, a legitimate expectation of privacy in the premises. *See United States v. Gonzalez*, 940 F.2d 1413, 1420 n.8 (11th Cir. 1991).[11] As a result, the Fourth Amendment protects an individual in those places where he can demonstrate a reasonable expectation of privacy against government intrusion. *See Katz v. United States*, 389 U.S. 347, 353 (1967). Fourth Amendment rights are personal, and only individuals who actually enjoy the reasonable expectation of privacy may challenge the validity of a government search. *Rakas v. Illinois*, 439 U.S. 128, 133-34, 143 (1978); *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000). An individual has standing to challenge a search if "(1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008). That is, a defendant must establish both a subjective and an objective expectation of privacy. *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006); *United States v. Robinson*, 62 F.3d 1325, 1328 (11th Cir. 1995). The subjective prong is a factual

---

[11] The undersigned recognizes that the Supreme Court disapproves of the use of the word "standing." *See Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978); *see also United States v. Hawkins*, 681 F.2d 1343, 1344-45 (11th Cir. 1982). However, the undersigned will use the word "standing" when referring to whether the defendants have an expectation of privacy because courts routinely use "standing" as "shorthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim." *United States v. Daniel*, 982 F.2d 146, 149 n.2 (5th Cir. 1993).

11

inquiry, *United States v. McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987); *United States v. Jones*, 184 Fed. Appx. 943, 947 (11th Cir. June 22, 2006); and "requires that a person exhibit an actual expectation of privacy," *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting *Segura-Baltazar*, 448 F.3d at 1286). The objective prong is a question of law, *McKennon*, 814 F.2d at 1543, and "requires that the privacy expectation be one that society is prepared to recognize as reasonable," *King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting *Segura-Baltazar*, 448 F.3d at 1286).

A legitimate expectation of privacy "by definition means more than a subjective expectation of not being discovered." *United States v. Whaley*, 779 F.2d 585, 590 (11th Cir. 1986) (quoting *Rakas*, 439 U.S. at 143, n.12). Assessing the legitimacy of a privacy expectation necessarily entails a balancing of interests. No single factor is determinative, *Oliver v. United States,* 466 U.S. 170, 177 (1984), and no one circumstance is talismanic to this inquiry, *United States v. Haydel*, 649 F.2d 1152, 1154 (5th Cir. Unit A Jul. 8, 1981). "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of . . . [the] inquiry." *United States v. Salvucci*, 448 U.S. 83, 92 (1980) (citation omitted). Other factors to

12

be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy, and whether he was legitimately on the premises. *United States v. Pitt*, 717 F.2d 1334, 1337 (11th Cir. 1983); *Haydel*, 649 F.2d at 1154-55.

Individuals also may have a "reasonable expectation of privacy against intrusions by police" into their business offices. *O'Connor v. Ortega*, 480 U.S. 709, 716 (1987) ("Within the workplace context, . . . an expectation [of privacy] in one's place of work is based upon societal expectations that have deep roots in the history of the [Fourth] Amendment." (citations and internal quotation marks omitted)). "The fact that the test of the legitimacy of an expectation of privacy is the same in both the residential and commercial sphere does not mean, however, that the factors which tend to be of probative value in resolving the inquiry when the governmental intrusion involves a residence, are to be accorded the same weight when the inquiry is directed at the legitimacy of a privacy expectation in commercial property." *United States v. Hall*, 47 F.3d 1091, 1095 (11th Cir. 1995). So, while "[a]n owner or operator of a business . . . has an expectation of privacy in commercial property, which society is

13

prepared to consider to be reasonable," *New York v. Burger*, 482 U.S. 691, 699 (1987), the "Supreme Court's treatment of the expectation of privacy that the owner of commercial property enjoys in such property has differed significantly from the protection accorded an individual's home," *Hall*, 47 F.3d at 1095 (11th Cir. 1995) (citing *Donovan v. Dewey*, 452 U.S. 594, 598-99 (1981)). Thus, unlike the nearly absolute protection of a residence, the "great variety of work environments" requires analysis of reasonable expectations "on a case-by-case basis." *O'Connor*, 480 U.S. at 718; *see also Burger*, 482 U.S. at 700 ("An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home."); *United States v. Chaves*, 169 F.3d 687, 690 (11th Cir. 1999) (noting there is a significantly diminished expectation of privacy in a business in comparison to a home); *McLaughlin v. Elsberry, Inc.*, 868 F.2d 1525, 1529 (11th Cir. 1988) ("While the operator of a business has a recognized expectation of privacy in his commercial property, that expectation is not as great as the similar expectation of privacy in one's home.") (citation omitted).

This reduced expectation of privacy does not mean that a defendant has no expectation of privacy in a place of business. *Chaves*, 169 F.3d at 691. Thus, "[t]he businessman, like the occupant of a residence, has a constitutional right to go about his

14

business free from unreasonable official entries upon his private commercial property." *Hall*, 47 F.3d at 1094 (quoting *See v. Seattle*, 387 U.S. 541, 543 (1967)). The "reasonable expectation of privacy depends upon the particular nature and circumstances surrounding the place to be searched." *Rakas*, 439 U.S. at 152-53; *see also Mancusi v. DeForte*, 392 U.S. 364, 368 (1968) (performing standing inquiry "in light of all the circumstances"). "[A] commercial proprietor has a reasonable expectation of privacy only in those areas where affirmative steps have been taken to exclude the public." *Hall*, 47 F.3d at 1096.

In addition, an expectation of privacy in business premises is analyzed in light of the legal form of the business. Although the Court's research has not found any Eleventh Circuit case discussing the expectation of privacy of a business operating as a sole proprietorship, one commentator has noted that a sole proprietor of a business has standing with regard to his place of business and business records. *See* Wayne R. LaFave, 6 Search & Seizure: A Treatise on the Fourth Amendment § 11.3(d) & n.217 (4th ed.).[12] A contrary position was articulated in

---

[12] However, the federal cases cited in the explanatory footnote by Professor LaFave do not support the broadly stated proposition. For example, in *United States v. Trickey*, 711 F.2d 56 (6th Cir. 1983), law enforcement investigating the defendant for counterfeiting obtained a search warrant for a small outer building located on the residential property of the defendant's nephew, which building the defendant rented

AO 72A
(Rev.8/8
2)

from his nephew. This small building had no working plumbing facilities, no furniture, and the windows were boarded up. The kitchen had been converted into a dark room and upon conducting a search, the agents found and seized a printing press, a camera, paper, ink and various other printing materials. In finding that the defendant had standing to challenge the warrant, the court held

> the appellant maintained his printing activity in an outbuilding that was located on residential property. He had boarded up the windows such that it was clear that he did not intend to expose this activity to the public. Rather, he exhibited both a subjective and an objective expectation that the information and activities conducted therein would remain private. Moreover, since appellant was the lessee of the premises, the activity which he exhibited an expectation of privacy for would certainly be recognized by society as legally justified. Clearly, both the owner and the lessee of the premises would be recognized by society as having a legitimate expectation of privacy as to the outbuilding.

> Furthermore, the assertion that the premises were maintained in a manner similar to a business does not abolish the proprietor's Fourth Amendment protections. It merely makes such protections less significant than they would be in the context of a home. The controlling factor in this inquiry is that the individual have a legitimate expectation of privacy in the premises. . . The appellant clearly has such a legitimate expectation in regard to the outbuilding and, therefore, he has standing to challenge the validity of the search warrant and to have the evidence suppressed during the trial.

*Trickey*, 711 F.2d at 58-59. Whether the defendant in that case had standing or not, the holding does not support a bold statement that a sole proprietor has Fourth Amendment standing in his business records.

Professor Lafave also cited *United States v. Morton Provision Co.*, 294 F. Supp. 385 (D. Del. 1968), which in turn relied upon *DeForte*, 392 U.S. 364 (1968). In *DeForte*, the defendant claimed standing to object to a warrantless search

AO 72A
(Rev.8/8
2)

*United States v. Miller*, No. 84 CR 728, 1985 WL 1590 (N.D. Ill. May 17, 1985), where the court found that a sole proprietor had no expectation of privacy in business records kept at one of his medical clinics because he allowed employees of the searched clinic to use those records in the course of business and thereby assumed the risk that other persons would have access to those business records. *Id*. at *3.

On the other hand, where a business is operated as a corporate structure, "the weight of precedent . . . clearly indicates that the possessory interest attendant to sole

---

of his union office and seizure of union documents therefrom. The office in which he worked was one large room shared with other union officials, and although the record did not establish from what part of the office the records were taken, the parties stipulated that he had custody of the records at the time they were taken and that he spent a considerable amount of time in the office. *Id.* at 368-69. The Supreme Court held that DeForte had standing. Recognizing that he would have had standing if the records were in an exclusive private office, the Court held that "DeForte still could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher-ups." *Id.* at 369. The *Morton Provision* Court held that the defendants similarly had standing "because the organizations involved here are quite small and the defendants evidently [were] the proprietors of the entire operations." *Morton Provision Co.*, 294 F. Supp. at 391.

However, in this Court's view, the *Morton Provision* holding would not survive application of the more restrictive view of standing following *Rakas*, just as some of the reasoning in *DeForte* is undermined by its reliance on the now-discarded "automatic standing" rule of *Jones v. United States*, 362 U.S. 257 (1960), *overruled by United States v. Salvucci*, 448 U.S. 83 (1980). *See DeForte*, 392 U.S. at 370 ("Our conclusion that DeForte had standing finds strong support in *Jones v. United States*, *supra.* ").

17

ownership of a corporation is not, in and of itself, sufficient to confer upon the owner Fourth Amendment standing as to all corporate property." *United States v. Okun*, No. 3:08-cr-132, 2009 WL 255624, at *4 (E.D. Va. Feb. 2, 2009) (citing cases). Indeed, the former Fifth Circuit has stated that where a corporate officer seeks to suppress illegally seized records and claims standing as a corporate officer, he does not establish standing because

> [w]hen a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole shareholder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment; documents which he could have protected from seizure, if they had been his own, may be used against him, no matter how they were obtained from the corporation. Its wrongs are not his wrongs; its immunity is not his immunity.

*United States v. Britt*, 508 F.2d 1052, 1055-56 (5th Cir. 1975) (quoting *Lagow v. United States*, 159 F.2d 245, 246 (2d Cir. 1946)). A substantial ownership interest in a corporation may be a factor to support a finding for standing; however, courts have concluded that the defendant must provide additional evidence of a relationship to the areas searched. *United States v. Torres-Ramos*, No. CR 06-656, 2008 WL 4667119, at *11 (C.D. Cal. Oct. 17, 2008); *see also United States v. Bush*, 582 F.2d 1016, 1019 (5th Cir. 1978) ("The interest of a stockholder and corporate officer in the property of

18

the corporation is not sufficient to provide that stockholder, in his individual capacity, with standing.").

To determine whether a corporate officer has standing, the former Fifth Circuit has identified the following nonexclusive factors: (1) whether the documents seized were prepared by the defendant; (2) where the searched information was stored (personal versus corporate storage); (3) whether the defendant was on the premises at the time of the search; and (4) whether the search was directed at corporate activity generally as opposed to the corporate officer personally. *Bush*, 582 F.2d at 1019. In other words, there must be a "nexus between the area searched and the work space of the defendant." *Britt*, 508 F.2d at 1056; *see also United States v. Vicknair*, 610 F.2d 372, 379-80 (5th Cir. 1980) ("When corporate property is seized or searched, an individual cannot assert the corporation's Fourth Amendment rights absent a showing that he had an independent privacy interest in the goods seized or the area searched.") (citations omitted); *see also* Wayne R. Lafave *et al.*, 3 Criminal Procedure § 9.1(c) (3d ed. Nov. 2010) ("Consistent with [*Mancusi v. DeForte*, 392 U.S. 364 (1968)], courts have held that a corporate or individual defendant in possession of the business premises searched has standing, and that an officer or employee of the

19

business enterprise has standing if 'there was a demonstrated nexus between the area searched and the work space of the defendant.' ") (footnotes omitted).

Generally, courts tend to find that these elements are sufficiently established when the area searched is set aside for the defendant's exclusive use, such as an individual office. However, courts are more skeptical of standing claims when the defendant only occasionally used the area searched. The greater the degree of exclusivity and control over a work area, and the more time a defendant spends there, the more likely standing is to be found. By contrast, the less private a work area—and the less control a defendant has over that work area—the less likely standing is to be found. *United States v. Hamdan*, 891 F. Supp. 88, 94-95 (E.D.N.Y. 1995) (citations omitted). For example, in *Henzel v. United States*, 296 F.2d 650 (5th Cir. 1961), the former Fifth Circuit held that the sole stockholder and president of a corporation had standing to challenge the seizure of corporate books and records when the individual had prepared much of the confiscated material, which was kept in his office along with his personal belongings. *Id.* at 653. In *Chaves*, the Eleventh Circuit found that the defendant had standing to contest a search of the warehouse, where he possessed the only key and he kept business and personal papers in the warehouse. *Chaves*, 169 F.3d at 691.

AO 72A
(Rev.8/8
2)

Although an analysis of a legitimate expectation of privacy in business premises necessarily must be determined on a case-by-case basis, there are several considerations that provide guidance. In *O'Connor*, the Supreme Court discussed the effect on the issue of standing when property seized from a defendant's workplace is personal property rather than business property:

> Because the reasonableness of an expectation of privacy, as well as the appropriate standard for a search, is understood to differ according to context, it is essential first to delineate the boundaries of the workplace context. The workplace includes those areas and items that are related to work and are generally within the employer's control. At a hospital, for example, the hallways, cafeteria, offices, desks, and file cabinets, among other areas, are all part of the workplace. These areas remain part of the workplace context even if the employee has placed personal items in them, such as a photograph placed in a desk or a letter posted on an employee bulletin board.

> Not everything that passes through the confines of the business address can be considered part of the workplace context, however. An employee may bring closed luggage to the office prior to leaving on a trip, or a handbag or briefcase each workday. While whatever expectation of privacy the employee has in the existence and the outward appearance of the luggage is affected by its presence in the workplace, the employee's expectation of privacy in the contents of the luggage is not affected in the same way. The appropriate standard for a workplace search does not necessarily apply to a piece of closed personal luggage, a handbag or a briefcase that happens to be within the employer's business address.

480 U.S. at 715-16; *see also* Wayne R. LaFave, Search & Seizure § 11.3(d) ("Particularly in an otherwise close case, a court may be influenced by the defendant's

21

AO 72A
(Rev.8/8
2)

relationship to or interest in the particular item seized. It may be significant, therefore, that this item is a personal possession of the defendant and not something connected with the operation of the business.").

To have standing, the defendant bears the burden of showing a legitimate expectation of privacy in the area searched. *Harris*, 526 F.3d at 1338; *United States v. Brazel*, 102 F.3d 1120, 1147 (11ᵗʰ Cir. 1997). A defendant may not establish standing by relying on the government's theory of the case. *United States v. Singleton*, 987 F.2d 1444, 1449 (9ᵗʰ Cir. 1993); *United States v. McNeal*, 82 F. Supp. 2d 945, 950 (S.D. Ind. 2000); *see also United States v. Henry*, No. 1:09-cr-522-TCB-GGB, 2010 WL 5559207, at *4 (N.D. Ga. Dec. 7, 2010) (R&R *adopted by* 2011 WL 65762 (N.D. Ga. Jan. 7, 2011)) ("The Government correctly contends that Defendant cannot show standing simply through the contentions of Government agents or the theory of the Government's case.") (citing *United States v. Zermeno*, 66 F.3d 1058, 1062 (9ᵗʰ Cir. 1995)).

### 2. *Analysis*

As an initial matter, the Court must determine whether McCullough operated BB&G in December 2010 as a sole proprietorship or in a corporate form; and if the former, whether he would be found to have an expectation of privacy solely by

AO 72A
(Rev.8/8
2)

operating the bar as a sole proprietorship. The Court concludes that McCullough did not establish that he operated the business as a sole proprietorship. The burden of proof to establish standing is upon McCullough, and this he failed to do. Government Exhibit 2 demonstrates that as of February 9, 2010, McCullough operated BB&G as a limited liability company. *See* O.C.G.A. 14-3-1622 (describing that a corporation must submit its successive annual registration statement between January 1 and April 1 to the Georgia Secretary of State). There is no evidence that the LLC was dissolved. While under Georgia law, a person doing business under a trade name (which is what McCullough described and which is the legal equivalent of a sole proprietorship) must only file a registration statement with the Clerk of the Superior Court of the county in which the business is chiefly carried on, O.C.G.A. § 10-1-490, McCullough has not demonstrated that his mere act of filing such a registration statement during the year that his business was registered as a LLC changes the nature of the entity's legal status.

In any event, even if McCullough validly operated BB&G as a sole proprietorship, the Court disagrees with the blanket statement of Professor LaFave that such ownership form automatically confers upon the business owner, without more, an expectation of privacy in the business premises and records. Given the Supreme Court's totality-of-the-circumstances approach to analyzing an expectation of privacy,

23

*Rakas*, 439 U.S. at 152-53, and the lesser privacy interest in property used for business purposes generally, *Burger*, 482 U.S. at 700; *Chaves*, 169 F.3d at 690 (finding a significantly diminished expectation of privacy in a business in comparison to a home), such a categorical approach would be inconsistent with these teachings.

Thus, the Court concludes that the analysis employed for business premises generally is appropriate, even if McCullough operated the business as a sole proprietorship, and the Court further concludes that McCullough did not establish standing to challenge the search of the BB&G office.

Applying the binding non-exclusive factors set out in the former Fifth Circuit's opinions in *Bush*, 582 F.2d at 1019, and *Britt*, 508 F.2d at 1055, first, there is no evidence that the documents seized were prepared in part, much less exclusively, by McCullough.[13] Unlike *Henzel*, 296 F.2d at 653, distinguished in *Britt*, *id.*, the record does not establish that any property, records or containers owned personally by McCullough were stored or maintained at the premises. Nor does McCullough claim that he authored any of the items seized or that he possessed any such items in his personal capacity.

_____

[13] McCullough's argument that the incriminating nature of the hard drive was not readily apparent goes to whether the hard drive was properly seized, not whether he has standing to challenge the search.

AO 72A
(Rev.8/8
2)

Second, there is no indication that the items searched for and seized were stored in personal containers as opposed to containers (such as a file cabinet, desk or safe) that appear to be company property. There was no evidence that he maintained any personal property or effects in the office. In short, there is no evidence "that any of the material seized there was taken from his personal desk or briefcase or files." *Britt*, 598 F.2d at 1055. Nor was there evidence that the business's files were the exclusive domain of McCullough.

Minimal steps were taken to safeguard privacy in the non-public areas of the premises. At the time of the officers' entry, the safe was unlocked and ajar. *Cf. United States v. Jefferson*, No. 09-CR-18, 2010 WL 1186279, at *5 (E.D. Wisc. Mar. 22, 2010) (recognizing notwithstanding defendant's subjective testimony that he took steps to keep contents of closet and bag private, the court credited the officer's testimony that the closet was not secured and the bag was open).

As to the steps taken to exclude the public, obviously, there is a greater expectation of privacy in the office area as opposed to the bar area, since the public was generally excluded from the office area. However, this begs the question of whether

AO 72A
(Rev.8/8
2)

McCullough had an independent *personal* expectation of privacy in the office area.[14]

McCullough testified that there was an "Employees Only" sign on the door to the stairway leading to the office, and that the door was locked. However, the evidence at the hearing demonstrates that the door was not locked at the time of the entry of the officers and that their access to the office area was unimpeded. While the general public may have been excluded from the office area, there were a number of employees who also had access to the office area, whether by themselves (managers and the janitor) or under the supervision of or with permission of the managers. Similarly, McCullough's argument that the government, in only calling the second officer who entered the office, did not establish thst the doorway to the office was locked, misapprehends the respective burdens of the parties in this matter. McCollough has the burden to demonstrate his standing, and thus it was his burden to establish that the office was secured from the public at the time of the search. McCollough has failed to satisfy his burden to show that he took reasonable steps to secure privacy in the office

---

[14]    *O'Rourke v. Hayes*, 378 F.3d 1201 (11th Cir. 2004), is of no help to McCullough. In *O'Rourke*, the Eleventh Circuit recognized that law enforcement may not make non-consensual entries into the non-public areas of a business without a warrant. *Id.* at 1206-07. There is no dispute that the Henry County Police needed a search warrant to search the non-public areas of the bar. Here, they had a search warrant to search the public and non-public premises, and thus *O'Rourke* is not illustrative.

since the evidence shows the door to the stairway was not locked even though the bar

was open for business when the officers arrived since the day manager was present.

Third, although like *Henzel*, McCullough spent many hours each day at the bar

(although the record is silent as to the amount of time he physically spent in the office),

he was not present on the premises at the time the warrant was executed there.[15, 16]

Fourth, the search and the warrant authorizing it were directed at corporate

activity generally as opposed to the corporate officer personally. While it is true that

a corporation can only act through its agents and the officers believed that McCullough

_____

[15]     In the Court's thinking, it does not matter whether McCullough's absence was due to his contemporaneous arrest while his home was being searched or not. This factor may appear obtuse, but what it gets at is the right of a person on the premises to control access to and possession of commercial property. The expectation of privacy in a business is less than a home if for no other reason than there is business-owner's expectation to invite the public onto his or her property. The owner's presence at or absence from commercial property during regular business hours thus is some indication of the owner's ability to exclude others from his establishment.

[16]     The Court also rejects McCullough's reliance on *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984). First, that case involved a defendant's claim that he had standing to challenge a search of his alleged girlfriend's apartment, which is factually inapposite to the instant case. Second, as the *Barron-Mantilla* Court recognized, standing is not automatic merely because a corporate employee has access to or control over certain areas. *See id.* at 870 (mere possession of a key to the premises searched is insufficient to confer standing).

AO 72A
(Rev.8/8
2)

was using business property to finance the grow houses, the information sought via the warrant was sought from business/corporate records and not personal records.

As for McCullough's reliance on *Gonzalez, Inc.*, the Court does not find that case to be illustrative of the legal principles involved in this case, nor is its reasoning applicable here. *Gonzalez, Inc.* dealt with a Title III wiretap, which has its own standing provision, 18 U.S.C. § 2518(10)(a), and which defines "an aggrieved person" as one, *inter alia*, "against whom the interception was directed." 18 U.S.C. § 2510(11). McCullough does not have an independent expectation of privacy in the premises solely because he was a subject of the investigation. *Alderman v. United States*, 394 U.S. 165, 171-72 (1969) ("The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence."). Second, the decision noted that the "the Supreme Court has held that owners of the premises where an illegal wiretap occurs have standing to challenge the interception, even if the owners did not participate in the intercepted conversations." *Gonzalez, Inc.*, 412 F.3d at 1116 (citations omitted). This is not consistent with general Fourth Amendment principles.

28

As a result, McCullough has not shown that he had a personal expectation of privacy in the area searched or the items seized in order to give him standing to challenge the search or the items seized. For these reasons, the undersigned **RECOMMENDS** that Joshua McCullough's motion to suppress evidence seized at the Backwoods Bar & Grill, located at 2220 Jodeco Road, McDonough, Henry County, Georgia, [Doc. 156], be **DENIED** because McCullough lacks standing to challenge the search. In the event the District Judge disagrees, the merits of the motion to suppress that were not disposed of in the earlier R&R are discussed below.

## II.     Merits

### A.     *The Search Warrant*

In Henry County Special Agent Ponder's search warrant affidavit for 2220 Jodeco Road, [*see* Warrant Aff. in Doc. 241 at Ex. G], Ponder stated as follows: In May 2010, a confidential source ("CS") informed Henry County law enforcement that the CS overheard a conversation concerning McCullough between two people at Backwoods Bar and Grill, which is located at 2220 Jodeco Road. The CS did not know the individuals, but the CS believed one was a regular guitarist at the bar. The conversation revealed that McCullough was going to open a new gym, which was going to be "a very sophisticated gym," and that McCullough's "silent partner" was going to

29

be Jimmy Ray. The CS only knew three Jimmy Rays, one of whom was Jimmy Ray Whorton who had jumped bond in 1982 when the CS was a bail bonds person.

A search of 925 Hemphill revealed a marijuana grow house. After the search, James McKenzie was arrested in a 2001 Chevrolet 1500 pick up truck and charged with marijuana manufacturing. Henry County law enforcement learned that the truck was registered to JSCJ Manufacturing and Distribution ("JSCJ Manufacturing") in Sandra Whorton's name at the 1396 Commerce Drive address. McKenzie advised that he was employed with Old South Amusement Incorporated ("Old South Amusement"). Ponder learned that McKenzie had worked at Old South Amusement with Karry Autry following the search at 166 Alexander Drive (Autry's residence), which also revealed a grow house.

Rebecca Harris owned JSCJ Manufacturing, and Sandra Whorton was registered as the CEO, CFO and Secretary. Harris also owned Old South Amusement, and Sandra Whorton served as the CEO, Jimmy Ray Whorton served as CFO, and Paul Bunch served as Secretary. The Whortons lived at 1828 Flat Rock Road.

A records check of Sandra Whorton revealed that there was an active warrant for her arrest from Bexar County, Texas, for commercial gambling. A records check of Jimmy Ray Whorton revealed that he was on probation and had a number of previous

30

arrests in the 1970s for theft and assault, in the 1980s for drug possession and drug trafficking, and in the 1990s for marijuana possession with the intent to distribute and commercial gambling. Henry County law enforcement was informed by Texas law enforcement that Jimmy Ray Whorton had been found with $55,000 in U.S. currency and small amounts of narcotics. Finally, Bunch had previous Georgia arrests for commercial gambling and fleeing or attempting to elude and Texas arrests from gambling.

A 2001 Isuzu truck registered to Preferred Amusements at 445 Hood Road, which did not have a valid Henry County Business Licensing Office, was seen at the 1680 Jodeco Road residence, which was under surveillance because of an anonymous tip that it was a grow house. The 445 Hood Road house is registered to Danielle McCullough, Joshua McCullough's spouse, and is Joshua McCullough's residence. Prior investigations into McCullough for illegal gambling revealed that he had a financial interest in Old South Amusement and was a known associate of the Whortons. A car registered to the Whortons was seen at the 1686 Jodeco Road address, which was alleged to be the residence of the people maintaining the grow house at 1680 Jodeco Road.

AO 72A
(Rev.8/8
2)

On November 29, 2010, the 2001 Isuzu truck that was observed at the 1680 Jodeco Road grow house was seen at Backwoods Bar and Grill, whose registered agent was McCullough.

A December 8, 2010, search of the 1680 and 1686 Jodeco Road residences found a sophisticated marijuana cultivation operation similar to the ones at 925 Hemphill Road and 166 Alexander Drive. The search uncovered several gaming machines set up to monitor the closed circuit security camera system, and these machines had labels indicating that they were owned by Old South Amusement and JSCJ Manufacturing. A box in the basement of the residence had a handwritten note on it, stating "For Josh," on it, which Ponder believed was referring to Josh McCullough.

Ponder believed that the above circumstances demonstrated that the Whortons' corporations as well as Backwoods Bar and Grill and Preferred Amusements were funding the grow houses. Ponder indicated that the grow houses were not in operation long enough to provide sufficient funding and that the cultivation processes were only in operation for two or three months and could not support themselves. He also asserted that it was reasonable that records relating to financial activity would be kept at residences and that the businesses kept gambling machines at these residences.

32

***B.***    ***Contentions of the Parties***

McCullough argues that the warrant affidavit contained minimal information to establish the probability that the items sought were located at 2220 Jodeco Road. [Doc. 156 at 3]. He next argues that the warrant was overly broad and did not authorize the seizure of firearms as they were crossed out from the warrant. [*Id.* at 4-5]. McCullough further argues that the warrant did not authorize the seizure of the purchase agreement for 436 Hood Road. [*Id.* at 5].

The government argues that there was probable cause to support the search because law enforcement was aware that the owner of Backwoods Bar and Grill supported the operation of the grow houses. [Doc. 236 at 42]. It also asserts that an Isuzu truck owned by Preferred Amusements was seen outside the grow houses at 925 Hemphill Road[17] and 1680 Jodeco Road and was parked outside of Backwoods Bar. [*Id.*]. Finally, the government argues that there was nothing to suggest that the agents did not reasonably rely in good faith on the validity of the warrant because it was not facially deficient or so lacking in indicia of probable cause as to render reliance

---

[17]    The Court was unable to find a reference in the search warrant application that the Preferred Amusements truck was observed at the Hemphill Road address.

AO 72A
(Rev.8/8
2)

upon it unreasonable and because the magistrate did not abandon the judicial role. [*Id.* at 51].

McCullough's reply brief merely reincorporates prior arguments from the motion to suppress. [Doc. 259 at 5-6].

## C.   *Discussion*

The parties' briefs raise two issues not yet decided: (1) whether probable cause supports a search of this business; and (2) whether law enforcement had a good-faith belief that the warrant was valid.[18]  The undersigned addresses each issue below.

### 1.   *Probable Cause*

Probable cause to support a search warrant exists when the totality of the circumstances allows a conclusion that there is a fair probability of finding contraband or evidence at a particular location.  *See United States v. Noriega*, 676 F.3d 1252, 1261 (11th Cir. 2012); *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991). "[P]robable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts[.]" *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999).  "[P]robable cause deals 'with probabilities.  These are not technical; they are the factual and practical considerations

---

[18]     The Court resolved the *Franks* issue in the earlier R&R.

34

of everyday life on which reasonable and prudent men, not legal technicians, act.' "
*Gates*, 462 U.S. at 241 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).
The task of the issuing magistrate judge in determining whether to issue a warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 232; *United States v. Tate*, 586 F.3d 936, 942-43 (11th Cir. 2009) (quoting *United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990)); *United States v. Jiminez*, 242 F.3d 1243, 1248 (11th Cir. 2000). "The nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." *Jenkins*, 901 F.3d at 1080 (citation and alteration omitted). A finding of a nexus does not require the affidavit to allege that the criminal activity took place at the location to be searched. *United States v. Khami*, 362 Fed. Appx. 501, 504 (6th Cir. Jan. 26, 2010) (citing *United States v. Jones*, 159 F.3d 969, 974-75 (6th Cir. 1998)); *see also United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006) ("One does not need Supreme Court precedent to support the simple fact that records of illegal business activity are usually kept at either a business location

or at the defendant's home. Likewise, personal financial records are also usually stored at a person's home or place of business.").

Also, to avoid "rigid" legal rules, *Gates* changed the "two-pronged test" of *Aguilar v. Texas*, 378 U.S. 108, 114 (1964), into a totality-of-the-circumstances test. *See Gates*, 462 U.S. at 230-35; *Brundidge*, 170 F.3d at 1352-53. Under the *Gates* totality-of-the-circumstances test, the "veracity" and "basis of knowledge" prongs of *Aguilar*, for assessing the usefulness of an informant's tips, are not independent. "[T]hey are better understood as relevant considerations in the totality of the circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for . . . by a strong showing as to the other[.]" *Gates*, 462 U.S. at 233; *Brundidge*, 170 F.3d at 1353. That is, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (citing *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000)). However, independent police corroboration is not a requirement in each and every case. *Brundidge*, 170 F.3d at 1353. For example, "[a]n 'explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles the [confidential informant's] tip to greater weight than might

36

otherwise be the case.' " *United States v. Robinson*, 202 Fed. Appx. 434, 436 (11th Cir. Oct. 27, 2006) (quoting *Brundidge*, 170 F.3d at 1353) (citations omitted in original).

In deciding whether to issue a search warrant, the issuing judge may rely upon the opinions and conclusions of an experienced law enforcement agent-affiant, *United States v. Robinson*, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995), since "[c]onduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." *United States v. Gonzalez*, 969 F.2d 999, 1004 (11th Cir. 1992) (quoting *United States v. Fouche*, 776 F.2d 1398, 1403-04 (9th Cir. 1985)).

Finally, "probable cause must exist when the magistrate judge issues the search warrant," *United States v. Santa*, 236 F.3d 662, 672 (11th Cir. 2000) (quoting *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994)), because a search is not to be made legal by what it turns up, *United States v. Di Re*, 332 U.S. 581, 595 (1948).

Then, the task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant, *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984), affording "great deference to judicial determination of probable cause to issue a search warrant," *Robinson*, 62 F.3d at 1331 (citing

37

AO 72A
(Rev.8/8
2)

*Gonzalez*, 940 F.2d at 1419).  Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable-cause determinations.  *Gates*, 462 U.S. at 236-37 (citing *United States v. Ventresca,* 380 U.S. 102, 109 (1965)); *see also United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994).  As the Supreme Court has instructed, "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."  *Upton*, 466 U.S. at 734 (quoting *Ventresca*, 380 U.S. at 109).

The Court concludes there was no probable cause to support the issuance of the search warrant for 2220 Jodeco Road for records about BB&G's funding of marijuana grow houses.  The only allegations in the warrant application that are relevant to such a conclusion are (1) the overheard conversation in the bar about "Jimmy Ray" financing an upscale gym for McCullough; (2) a truck registered to Preferred Amusements at an address known to be McCullough's residence was observed at a residence which was later found to be a grow house and was observed also at BB&G; (3) a box at one of the

38

grow houses on Jodeco Road was labeled "For Josh." These statements, even when considered in light of some connection between McCullough and the Whortons, applying exceptional deference to the issuing judge and keeping in mind that in close cases the warrant is to be found valid, do not amount to probable cause that evidence of marijuana grow house funding would be located at BB&G.

The overarching distinction between this warrant and the warrants for 1396 Commerce Drive, Suites A and B, which the Court found to be supported by probable cause, [*see* Doc. 489 at 31-35], is that the latter warrants contained statements establishing a nexus between the grow houses and the businesses at issue, including the use of corporate assets to facilitate the grow house operations. No such nexus exists as to this warrant. The single sighting of the Preferred Amusement truck at BB&G and one of the grow houses is insufficient to establish that the BB&G was being used to finance grown houses and that evidence of the same would be located in the books and records of that business.

### 2. Leon *Good Faith*

Since the Court concludes that the BB&G search warrant was not supported by probable cause, the Court must determine whether the warrant's invalidity is saved by application of the good-faith exception. The Supreme Court has established a "good

39

faith" exception to the exclusionary rule to prevent suppression of the items found pursuant to a search warrant. Under *United States v. Leon*, 468 U.S. 897, 913 (1984), the "good faith" exception to the rule requiring the suppression of evidence for violations of the Fourth Amendment keeps evidence from being suppressed when law enforcement officers obtain evidence through objective good-faith reliance on a facially valid warrant that is later found to lack probable cause. *See United States v. Gonzalez*, 969 F.2d 999, 1004 n.4 (11th Cir. 1992). Nevertheless, "it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Leon*, 468 U.S. at 922-23. Thus, *Leon*'s good-faith exception does not apply to the following situations: (1) where the magistrate in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—*i.e.,* in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot

40

reasonably presume it to be valid. *United States v. Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003).

The Court finds that the affidavit in this case was so lacking in probable cause as to render official belief in its existence entirely unreasonable; thus, the third exception to the *Leon* good-faith exception applies, and *Leon* does not cure the warrant's invalidity. *See Leon*, 468 U.S. at 915; *Robinson*, 336 F.3d at 1296; *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998). The affidavit in support of the warrant failed to lay out sufficient facts in support of the affiant's belief that evidence of the BB&G's financing of the sophisticated grow houses would be located on the premises. *Compare United States v. Fowlie*, 24 F.3d 1059, 1067 (9th Cir. 1994) ("The affidavit contained the affiant's plausible theory that the property was used as a 'safe house' for drug distribution."). The affidavit failed to establish any significant connection between the business premises and McCullough (on the one hand), and the grow houses (on the other). The affidavit did not demonstrate that any equipment or vehicles associated with BB&G were employed to facilitate the grow house operations, unlike property and other assets of the Whortons' businesses. That a truck registered to one of McCullough's businesses was seen one time at a grow house and at BB&G, and a box labeled "For Josh" was found at the grow house, is insufficient basis to find

41

objectively that the warrant was supported by probable cause. As a result, the affiant's belief that there was probable cause to believe that BB&G was funding the grow houses is a " 'bare-bone' statement of nothing more than conclusory allegations." *Leon*, 468 U.S. at 915. Thus, the good-faith exception does not save the warrant.

As a result, if the District Court concludes that if McCullough has standing to contest the search warrant at Backwoods Bar & Grill, then the undersigned would recommend that his motion to suppress be granted because the warrant was not supported by probable cause and is not saved by *Leon* good faith.

## III. Conclusion

In conclusion, the undersigned **RECOMMENDS** that Joshua McCullough's motion to suppress evidence, [Doc. 156], be **DENIED**.

**IT IS SO RECOMMENDED**, this the ___8th___ day of October, 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)